**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 7, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

DANA GIELISSEN,

     Plaintiff - Appellant,

v.

RELIANCE STANDARD LIFE
INSURANCE COMPANY; MATRIX
ABSENCE MANAGEMENT, INC.,

     Defendants - Appellees.

No. 21-1377
(D.C. No. 1:20-CV-03213-LTB-MEH)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **TYMKOVICH**, **BALDOCK**, and **CARSON**, Circuit Judges.
_____

Reliance Standard Life Insurance Company, acting through its claims administrator, Matrix Absence Management, Inc., terminated Dana Gielissen's long-term disability benefits after concluding that she no longer qualified for them. Gielissen's disability benefits are governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461, so she filed suit in federal district

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

court challenging that termination, *see id.* § 1132(a)(1)(B).  The district court entered judgment in favor of Reliance Standard, and Gielissen now appeals.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.    BACKGROUND

### A.    Reliance Standard's Initial Award of Disability Benefits

Gielissen worked as a physical therapist assistant until April 2016.  That month, she took leave to undergo cochlear implant surgery, which she hoped would mitigate a longstanding hearing impairment.  After the surgery, she began experiencing significant problems with her ability to balance.  This condition severely limited her ability to work with physical therapy patients.

Gielissen was covered by a Reliance Standard long-term disability policy that pays benefits for up to two years if the disability prevents the covered employee from performing his or her own occupation (the "own-occupation" benefit).  The policy pays benefits beyond that only if the covered employee cannot perform any occupation that the employee's training, education, and experience will reasonably allow (the "any-occupation" benefit).

In August 2016, Gielissen applied to Reliance Standard for long-term disability benefits based on her balance problems.  While Reliance Standard evaluated her application, Gielissen applied for Social Security disability benefits. The Social Security Administration determined that Gielissen's vertigo and hearing loss matched the requirements for a listed impairment.  It accordingly awarded benefits in December 2016.

In May 2017, Reliance Standard approved Gielissen's disability claim and awarded benefits retroactive to October 2016. Its letter announcing as much stated that the first twenty-four months (*i.e.*, the own-occupation benefit) would expire in October 2018.

**B.    Reliance Standard's Decision to Approve Continuing Disability Benefits After Twenty-Four Months**

In June 2018, Reliance Standard sent a letter to Gielissen stating that it was beginning its investigation of her eligibility for disability payments beyond October 2018 (*i.e.*, the any-occupation benefit). As part of that investigation, Reliance Standard collected Gielissen's recent medical records. It also had Gielissen fill out a lengthy questionnaire, in which she described her condition as follows:

> [D]ifficulty bending over without falling over, frequent or near falls that require use of walking sticks or the arm of a friend or family member for assistance with my balance. I have difficulty sitting for long periods of time due to a spinal fusion. My hands currently are preventing me from writing much or typing on my computer.

R. vol. II at 607. Regarding her hands, she added that she had limited ability to "grip, write, [and] type due to pain." *Id.* She also described ongoing treatment for anxiety and ADHD. Finally, in a section about hobbies and interests, she reported "low level" hiking "with friends assist[ing]" on a monthly basis, and walking with friends weekly. *Id.* at 611.

In early October 2018, a Reliance Standard nurse reviewed the information collected about Gielissen. The nurse particularly noted a November 2017 visit to the cardiologist, at which Gielissen stated she had been "active with hiking and daily

3

activities without limitations." R. vol. I at 128. The nurse opined, however, that "this [report] is not reliable at this time due to recent progress notes overweighing current status." *Id.* The nurse emphasized the combination of Gielissen's vestibular impairment, anxiety, ADHD, and her newly reported hand pain, and concluded that Gielissen "still lacks any consistent level of work function." *Id.* The nurse specifically ruled out sedentary jobs "at this time due to ongoing bilateral hand signs and symptoms impacting function." *Id.* Once her ongoing symptoms became "stable," however, the nurse suggested that vocational rehabilitation "may be helpful." *Id.*

Soon afterward, Reliance Standard wrote to Gielissen, announcing that she met the qualifications for the any-occupation benefit, so her payments would continue "until [she] no longer [met] the provisions of [the] policy." *Id.* at 332.

### C. Reliance Standard's Further Investigation & Decision to Terminate Benefits

A December 2018 claim note shows that Reliance Standard continued to evaluate Gielissen's eligibility after approving the any-occupation benefit. The claim note describes "contradictory information regarding [Gielissen's] imbalance," referring to a June 2017 medical record in which she claimed significant troubles with her balance, as compared to the November 2017 cardiologist visit where she reported no limitations with activities such as hiking. *Id.* at 239. The claim note further summarizes medical records from earlier in 2018 reflecting that Gielissen told her doctor she was doing part-time pet sitting.

4

A claim examiner required Gielissen to fill out a new questionnaire about her activities of daily living. She responded with the same answers she gave in her questionnaire the previous summer (*i.e.*, balance problems, difficulty sitting for long periods of time, and difficulty using a computer due to hand pain).

The examiner ordered three days' covert surveillance. In late January 2019, an investigator captured video of Gielissen walking a dog for at least twenty minutes. Gielissen walked with a widened gait and sometimes held her free arm away from her body, but she did not use an assistive device (like a walking stick). Moreover, substantial snow had recently fallen, yet Gielissen had no trouble stepping over snowbanks or walking on yet-to-be-shoveled sidewalks. She also appeared unfazed when tugging on the leash, and she had no visible trouble stepping into a snowy yard and leaning far over to pick up after the dog.

In early February 2019, an investigator captured another video of Gielissen. This short video shows her ascending two steps onto the front porch of a home, opening the screen door, knocking on the front door, and entering the home. As with the previous video, she did not use an assistive device and no brace is visible.[1]

By letter dated March 5, 2019, Reliance Standard informed Gielissen what it had learned through the video surveillance. "Based on this," it said, "we have concluded that you have no limitations with balance, walking, [or] bending and you

---

[1] The investigator's surveillance notes say that Gielissen left the home about fifteen minutes later, and, without assistance, walked down the porch steps and down the length of driveway to her car parked along the street. The investigator said he could not film this sequence, however, for fear of revealing himself.

do not need assistance with these activities." *Id.* at 348. As for her hand pain, Reliance Standard stated that it had contacted Gielissen's rheumatologist, "asking [her] to outline any restrictions on the use of [Gielissen's] hands." *Id.* The rheumatologist's office responded that the doctor "does not fill out disability paperwork and would not provide restrictions and limitations." *Id.* Reliance Standard accordingly could not "verify the limitations [Gielissen] reported regarding [her] hands." *Id.* For those reasons, Reliance Standard terminated Gielissen's any-occupation payments.

### D.    The Internal Appeal

Gielissen initiated an internal appeal in August 2019. She included an affidavit explaining that her abilities as seen in the two videos reflect her desire to push herself sometimes, but she was nonetheless taking substantial risks when she did so.

Gielissen also attached an affidavit from a physical therapist, to whom Gielissen had shown the surveillance videos. The physical therapist opined that the dog-walking video showed Gielissen walking

> with an ataxic or uncoordinated gait for at least two reasons: (1) she is walking with an unnaturally wide base of support indicating she is unsure of her balance and compensating, and (2) her right arm is unusually far away from her body (while holding the dog's leash in her left hand a normal distance from her body) indicating a compensatory strategy to adjust for balance issues.

R. vol. III at 899, ¶ 7.  Regarding the shorter video in which Gielissen ascends two steps onto a porch, the therapist further opined that Gielissen briefly showed a stance or posture suggesting either hip weakness or balance problems.

Reliance Standard requested a review of the file by an independent physician, Dr. Ross Clark, whose specialty is otolaryngology.  There is no indication that the surveillance videos were part of what Dr. Clark reviewed.  The centerpiece of his review, rather, was a telephone call with Dr. Crista Keller, Gielissen's longtime primary care physician.  According to Dr. Clark, Dr. Keller said that Gielissen "is unable to perform her previous occupation as a PT assistant, but could work in a sedentary capacity; although [Dr. Keller] is not certain if[] [Gielissen] could work at a computer screen."  R. vol. IX at 3880.

Reliance Standard asked Dr. Clark to "provide a detailed explanation regarding presence or absence of impairment as of 3/1/2019.  Please include references to medical records included in your review.  Report must include the basis for your opinion."  *Id.* at 3881.  Dr. Clark's entire response to this directive was a single sentence: "The employee would be able to work in a sedentary position from the ENT perspective from 3/1/19."  *Id.*  He then checked a box on the form indicating that Gielissen can perform sedentary work, and he wrote in some additional postural restrictions, such as no bending or stooping.  Finally, in a section of the form regarding Gielissen's medications and how they might affect her abilities, Dr. Clark said, "[Gielissen] is on neuropsychologic meds . . . which are out of this reviewer's purview."  *Id.* at 3882.

7

Reliance Standard sent Dr. Clark's opinion to a vocational rehabilitation specialist. He opined that someone with the limitations described in Dr. Clark's opinion could perform jobs such as appointment clerk and outpatient receptionist.

In December 2019, Reliance Standard sent Dr. Clark's and the vocational specialist's opinions to Gielissen and invited her to submit any additional information she would like Reliance Standard to consider. She submitted Dr. Keller's notes of the call with Dr. Clark. According to Dr. Keller, Dr. Clark "asked about [Gielissen's] ability to do desk work—I expressed that the one concern I would have is her ability to do computer work—? It that [sic] could aggravate her symptoms. However I would not be able to specifically evaluate this." R. vol. I at 361.

In January 2020, Reliance Standard sent Gielissen a letter denying her appeal. Reliance Standard explained that it relied on Dr. Clark's and the vocational specialist's opinions. Concerning Dr. Keller's notes of the call with Dr. Clark, Reliance Standard said that Dr. Keller's version "does not provide information indicating or supporting a different assessment of [Gielissen's] function [than] what has been assessed by Dr. Clark." *Id.* Reliance Standard also said that it considered the fact of her ongoing Social Security disability payments but was unpersuaded because the Social Security Administration made its decision more than three years earlier, and Reliance Standard had since gathered more information about Gielissen's abilities and limitations.

8

## II.    PROCEDURAL HISTORY

Gielissen filed suit in the United States District Court for the District of Colorado, challenging Reliance Standard's decision. "The parties agree[d] that the termination of Ms. Gielissen's LTD benefits [was] subject to de novo review." Aplt. App. vol. 1 at 131. Applying de novo review, the district court concluded that the record supported Reliance Standard's decision. The court therefore entered judgment in Reliance Standard's favor, and Gielissen timely appealed.

## III.    STANDARD OF REVIEW

Reliance Standard views the district court's decision as equivalent to findings of fact and conclusions of law entered after a bench trial. It therefore argues that, although the district court appropriately applied de novo review, *this* court should review the district court's decision for clear error. But the case Reliance Standard cites in support—*Ramos v. Banner Health*, 1 F.4th 769 (10th Cir. 2021)—was an appeal from an actual bench trial, and the claim at issue was whether the defendants breached their ERISA fiduciary duty to manage plan participants' retirement contributions prudently, *see id.* at 773–74. That has nothing to do with the type of claim at issue here. Reliance Standard's proposed approach also conflicts with our pre-existing case law stating that "[w]e review a plan administrator's decision to deny benefits to a claimant, as opposed to reviewing the district court's ruling." *Holcomb v. UNUM Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009).

Thus, we will review de novo Reliance Standard's decision to terminate Gielissen's any-occupation benefits. *See Firestone Tire & Rubber Co. v. Bruch*,

9

489 U.S. 101, 115 (1989) (requiring de novo review absent a reservation of discretion not present here). We limit that review to the record before Reliance Standard at the time it made its decision. *See Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1202 (10th Cir. 2002).[2]

## IV.    ANALYSIS

### A.    Denying vs. Terminating Benefits

Citing to non-precedential case law, Gielissen argues that a plan administrator "must have sufficient reason to reverse [its previous] determination [that a claimant is disabled]." Opening Br. at 29. In particular, she believes that the administrator needs new medical evidence. *See id.* at 30–31.

We need not decide this issue as a general matter. In this case, Reliance Standard relied on Dr. Clark's opinion, which in turn relied on Dr. Keller's observations. Thus, if there is a new-medical-evidence requirement, Reliance Standard satisfied it.[3] The question, instead, is whether this and other evidence provided "sufficient reason to reverse [Reliance Standard's previous] determination [that Gielissen is disabled]." *Id.* at 29. Thus, we turn directly to that analysis.

---

[2] In a de novo case such as this, the district court might expand the record in exceptional circumstances. *See Hall*, 300 F.3d at 1202–03. No party asked for that here.

[3] We do not mean to say that Dr. Clark's opinion is the only item in the record that counts as new medical evidence. Indeed, Gielissen does not define what she means by "medical evidence." But she acknowledges that Dr. Clark was Reliance Standard's "medical reviewer," Opening Br. at 26, so we do not see how she could view his report as anything other than "medical evidence," even if she disagrees with it.

### B.     Correctness of Reliance Standard's Decision

Our review is de novo, but this does not mean we step into the role of the plan administrator, evaluating the record and deciding for ourselves whether the claimant qualifies for benefits.  Rather, we confine our review to the reasons given by the administrator for denying or discontinuing benefits.  *See LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 801 (10th Cir. 2010).  Our review is nonetheless de novo in the sense that we owe no deference to the administrator's reasoning, in contrast to the arbitrary and capricious standard.  *See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) ("When reviewing under the arbitrary and capricious standard . . . [t]he reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end." (internal quotation marks and brackets omitted)).[4]

Gielissen treats both the initial and appeal decisions as collectively embodying Reliance Standard's reasons for terminating benefits, so we will do the same.[5]  Her

---

[4] As previously discussed, we review Reliance Standard's decision, not the district court's decision.  *See Holcomb*, 578 F.3d at 1192.  We note, however, that the district court did not confine itself to the reasons given by Reliance Standard.  *See, e.g.*, Aplt. App. vol. 1 at 135, 137 (discussing "[o]ther evidence in the record [that] supports Ms. Gielissen's ability to perform sedentary work," beyond what Reliance Standard discussed in its initial or appeal decisions).  For the reasons stated immediately above, this was improper.

[5] To be clear, Gielissen's choice to treat the two decisions together is debatable.  The initial decision was based on the surveillance videos and concludes that Gielissen's balance issues no longer limit her.  In other words, the initial decision implies that Gielissen can return to her *previous* job—although that decision

11

argument is somewhat unfocused, but it appears to run essentially as follows:  The

vocational specialist's opinion is only as good as Dr. Clark's opinion, and Dr. Clark's

opinion is inadequate to support termination of benefits, for various reasons.

Therefore, the only potentially relevant evidence was the surveillance videos

discussed in the initial decision—and without expert medical interpretation, the

videos cannot justify terminating benefits.

Given the structure of this argument, we need not address Dr. Clark's opinion

if we agree with Reliance Standard's initial decision that the surveillance videos

justify terminating benefits.[6]  We therefore turn directly to that issue.

Gielissen argues not only that the surveillance videos mean nothing without

expert medical interpretation, but also that Reliance Standard failed to discuss the

only expert medical interpretation in the record.  She refers to the affidavit from a

physical therapist who opined that the videos displayed behaviors one would expect

---

does not actually identify any job she could perform.  The appeal decision, by
contrast, says nothing about the surveillance videos and relies on Dr. Clark's and the
vocational expert's conclusions that Gielissen can perform *sedentary* jobs.  So the
initial and appeal decisions arguably rely on non-overlapping evidence and
reasoning.  (Neither Dr. Clark nor the vocational expert show any awareness of the
surveillance videos.)  That said, Gielissen offers no argument in this vein, *e.g.*, that
Reliance Standard rendered two distinct decisions, each of which must be evaluated
on its own terms, or that only the appeal decision counts because it was the final
decision.  She accordingly forfeits any such argument and we do not consider it.  We
instead take her argument as presented, *i.e.*, that the initial and appeal decisions
should be treated as one collective decision.

[6] The initial decision was also based on Reliance Standard's inability to verify
Gielissen's complaints of hand pain.  Gielissen offers no argument about that part of
Reliance Standard's reasoning.

from a person compensating for balance problems (widened gait and holding an arm away from the body).

Reliance Standard has a duty to "consider the evidence presented by both [sides] prior to reaching and rendering [its] decision." *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (internal quotation marks omitted). But Gielissen cites no authority requiring Reliance Standard to *discuss* all available evidence, much less providing a remedy for that failure.

We disagree in any event with the underlying premise that Reliance Standard needed expert medical testimony to interpret the surveillance videos. Accepting the physical therapist's opinion as true (*i.e.*, the videos show a person compensating for balance problems), the videos nonetheless show that Gielissen can walk briskly and steadily for at least twenty minutes, including over occasionally uneven and potentially slippery terrain. The relevance of that evidence to her disability status is beyond question.

Reliance Standard never said what jobs it believes Gielissen can perform in light of the abilities demonstrated in the surveillance videos, but vocational evidence is not required in every case, *see Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1290 (10th Cir. 2002). More importantly, Gielissen does not argue that Reliance Standard erred by failing to seek vocational evidence or to identify jobs she could perform based on the abilities demonstrated in the videos. Given that, we conclude that Reliance Standard properly relied on the videos to determine that Gielissen was no longer restricted from performing any occupation.

V.    **CONCLUSION**

We affirm Reliance Standard's decision to terminate benefits.

Entered for the Court

Timothy M. Tymkovich
Circuit Judge